Slip Op. 10-14

# UNITED STATES COURT OF INTERNATIONAL TRADE

-------------------------------------------------------x
:
LEMANS CORPORATION, :
:
         Plaintiff, :
:
         v. : **Before: Judge Judith M. Barzilay**
: **Court No. 06-00038**
UNITED STATES, : **Public Version**
:
         Defendant. :
:
-------------------------------------------------------x

## **OPINION**

[Defendant's Motion for Summary Judgment is granted, and Plaintiff's Cross-Motion for Summary Judgment is denied.]

Dated: February 8, 2010

*Rodriguez, O'Donnell, Gonzalez & Williams, P.C.* (*Thomas J. O'Donnell*, *Jessica R. Rifkin*, and *Lara A. Austrins*), for Plaintiff LeMans Corporation.

*Tony West*, Assistant Attorney General; *Barbara S. Williams*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Alexander Vanderweide*); and Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs & Border Protection (*Michael W. Heydrich*), of counsel, for Defendant United States.

Barzilay, Judge: This case concerns the U.S. Customs & Border Protection's ("Customs") classification of certain motocross jerseys, motocross pants, and motorcycle jackets under Chapters 61 and 62 of the Harmonized Tariff Schedule of the United States ("HTSUS").

Defendant United States moves the court for summary judgment, arguing that Customs classified the subject merchandise under the appropriate provisions of the HTSUS. Plaintiff LeMans Corporation ("LeMans" or "Plaintiff") contests the classification and cross-moves the court for summary judgment, alleging that subheadings within Chapter 95 of the HTSUS covering sports equipment most accurately describe the subject jerseys, pants, and jackets. In view of the applicable General Rules of Interpretation ("GRIs") and for the reasons explained below, the court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment.

## I.  Background

### A.  The Subject Merchandise

LeMans imported the subject merchandise into the United States through the ports of Chicago and Los Angeles between July 20, 2004 and September 17, 2004.[1] Summons 3-4. The merchandise consists of "highly specialized" jerseys, pants, and jackets "designed, engineered, and produced exclusively for use while participating in motocross activities and other power sports riding." Pl.'s Resp. to Def.'s First Interrogs. & Reqs. for Produc., Def. Mot. for Summ. J. Ex. C at 5 ("Pl. Resp. to Def. First Interrogs."). The dual purposes of the goods "prevent injury to the rider from abrasion and impacts with motorcycle parts and the surrounding elements, as well as . . . provide optimal fit and comfort while participating in the sport." Pl. Resp. to Def. First Interrogs. 5.

---

[1] Entry Nos. 279-9313291-2, 279-9313582-4, 279-9313588-1, 279-9313790-3, 279-9313997-4, 279-9316067-3, 279-9316419-6, 279-9317228-0, 279-9317410-4, 279-3205158-7, 279-3205173-6, 279-3205154-6. Summons 3-4.

Synthetic, abrasion-resistant mesh and ventilated knit patterned fabric, which also wicks away moisture, makes up the five motocross jerseys at issue.[2]  Pl. Resp. to Def. First Interrogs. 6. "The jerseys have padded elbows for abrasion and impact protection" and "form an integrated protection system" with the use of "a tacky silicon print on the lower back to keep the jersey tucked into the motocross pant when riding."  Pl. Resp. to Def. First Interrogs. 6.  An oversized, multi-panel cut allows for a non-binding fit so that other safety equipment, which if permanently affixed in the good would result in improper fit and inadequate safety,[3] may be worn under the jersey.  Pl. Resp. to Def. First Interrogs. 6.

Six different models comprise the subject pants,[4] and riders generally use the goods off-road on motocross tracks, supercross tracks, or on other off-road courses.  Dep. of Jeffrey T. Hart, Def. Mot. for Summ. J. Ex. B at 12:12-16 ("Hart Dep.").  Heavy-duty nylon provides riders with impact and abrasion protection, and the pants contain additional comfort features, such as "mesh panels for venting, heat resistant inner leg areas (made of leather or man[-]made fibers) to prevent burns from the engine and exhaust pipe, and spandex and stretch panels to allow freedom of movement and a non[-]binding fit in the legs, seat, and crotch area."  Pl. Resp. to Def. First

---

[2] The relevant jersey models include the Men's and Boy's Phase S5, Men's and Boy's Core S5, and the Men's AC S5.  Compl. ¶ 8.

[3] The typical safety equipment worn under the jerseys consist of chest, kidney, and elbow guards.  Pl. Resp. to Def. First Interrogs. 6.

[4] The pertinent pant models include the AC S5, Core S5, Core S5 Youth, XCR, M1 Kids, and M1.  Compl. ¶ 7.

Interrogs. 5. To ensure freedom of movement, the pants also include [[         ]] hip padding instead of alternative rigid protective elements.[5] Pl. Resp. to Def. First Interrogs. 5.

Finally, the LeMans motorcycle jackets at issue are the Super Duty, Merc, Tarmac, and the Airtex Sport.[6] Compl. ¶ 9. Heavy-duty materials provide protection to the rider on the public street from impact and abrasion injuries "which may result from a crash or fall, including the initial impact and the sliding contact with the pavement." Pl. Resp. to Def. First Interrogs. 6. Internal armor pads, constructed of [[    special material    ]], appear in the shoulders and elbows, "the highest impact areas in the event of crashes or falls." Pl. Resp. to Def. First Interrogs. 6. The jackets also feature a [[               ]] back pad for added protection. Pl. Resp. to Def. First Interrogs. 6. LeMans designed the jackets to fit closely to the

---

[5] The Core, XCR, and M1 models contain [[   various types of padding,   ]] approximately [[  ]] thick, while the AC model includes [[   other certain padding   ]]. Pl. Resp. to Def. First Interrogs. 5. The two Core, XCR, M1, and AC models also incorporate [[ ]] padding [[               ]] in the seat or tail area. Pl. Resp. to Def. First Interrogs. 5. [[   Various   ]] patches on the upper seat area provide additional impact protection in the Core, XCR, and M1 models. Pl. Resp. to Def. First Interrogs. 5.

[6] More specifically, the Super Duty contains a "heavyweight waxed cotton chassis with leather sleeves," shoulder and elbow armor pads that meet more stringent European standards, "[[    a    ]] back pad, and zippered chest vents." Pl. Resp. to Def. First Interrogs. 7. The Merc consists of a "heavyweight Dynax Nylon chassis, [European-]approved shoulder and elbow armor pads, [[    a    ]] back pad and ribbed spandex panels under the arms for ventilation, [and a] zipper cover on bottom of [the] front zipper to prevent scratches to the motorcycle gas tank." Pl. Resp. to Def. First Interrogs. 7. Finally, the Tarmac includes a "heavyweight knitted polyester mesh chassis . . . , [European-]approved shoulder and elbow armor pads, [[   a   ]] back pad, [and] leather elbows," while the Airtex Sport contains a "heavyweight polyester mesh chassis, [European-]approved shoulder and elbow armor pads, [[    a    ]] back pad, [as well as an] adjustable waist band, reflective logo on [the] back to enhance nighttime visibility, [and] rubber coated snaps to prevent scratches to the motorcycle gas tank." Pl. Resp. to Def. First Interrogs. 7.

rider's body and tapered the sleeves snugly around the wrist "to keep the jacket in proper position while riding or during a crash." Pl. Resp. to Def. First Interrogs. 6. The jackets also accommodate a rider's posture with a cut that has longer sleeves and fuller shoulders, with zippered vents or mesh providing "airflow into the jacket for various riding conditions." Pl. Resp. to Def. First Interrogs. 6-7.

In summary, all the subject merchandise are readily recognizable as articles of clothing albeit with certain specialized protective features, some minimal, some more significant.

**B. The Subject Classification**

Customs classified the subject merchandise under five subheadings within Chapters 61 and 62 of the HTSUS.[7] The agency entered the relevant motocross jerseys as "Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: Of man-made fibers: Other" under subheading 6110.30.30 of the HTSUS at a duty rate of 32% *ad valorem*. Compl. ¶¶ 13, 20. Customs classified the subject motocross pants as "Garments, made up of fabrics of heading 5602, 5603, 5903, 5906 or 5907: Other men's or boy's garments: Of man-made fibers: Other" under subheading 6210.40.50 of the HTSUS at a duty rate of 7.1% *ad valorem*.[8] Compl. ¶¶ 11, 19. Finally, Customs found that the various motorcycle jackets fit

---

[7] All citations to the HTSUS refer to the 2004, as determined by the date of importation for the merchandise.

[8] Headings 5602, 5603, 5903, 5906, and 5907 of the HTSUS cover certain fabrics. Heading 5602 includes "Felt, whether or not impregnated, coated, covered or laminated," while Heading 5603 provides for "Nonwovens, whether or not impregnated, coated, covered or laiminated." Under the other three provisions, Heading 5903 encompasses "Textile fabrics impregnated, coated, covered or laminated with plastics, other than those of heading 5902," Heading 5906 comprises "Rubberized textile fabrics, other than those of heading 5902," and

within three separate provisions of Heading 6201, HTSUS, and classified and liquidated the

Airtex Sport and Merc models under subheading 6201.93.30 at a duty rate of 7.1% *ad valorem*,

the Tarmac jacket under 6201.93.35 at a rate of 27.7% *ad valorem*, and the Super Duty model

under 6201.92.15 at a rate of 6.2% *ad valorem*.⁹  Compl. ¶¶ 14-15, 21; Answer ¶ 15.

---

Heading 5907 concerns "Textile fabrics otherwise impregnated, coated or covered; painted canvas being theatrical scenery, studio back-cloths or the like."

⁹ Heading 6201 of the HTSUS covers in pertinent part:

| | |
|---|---|
| 6201 | Men's or boys' overcoats, carcoats, capes, cloaks, anoraks (including ski-jackets), windbreakers and similar articles (including padded, sleeveless jackets), other than those of heading 6203[(which covers "Men's or boys' suits, ensembles, suit-type jackets, blazers, trousers, bib and brace overalls, breeches and shorts (other than swimwear)")]: |
| | . . . |
| | Anoraks (including ski-jackets), windbreakers and similar articles (including padded, sleeveless jackets) |
| | . . . |
| 6201.92 | Of cotton. |
| | . . . |
| | Other: |
| 6201.92.15 | Water resistant. |
| | . . . |
| 6201.93 | Of man-made fibers: |
| | . . . |
| | Other |
| | . . . |
| | Other |
| | . . . |
| | Other |
| 6201.93.30 | Water resistant. |
| 6201.93.35 | Other. |

## II. Subject Matter Jurisdiction & Standard of Review

The Court has exclusive jurisdiction over all civil actions commenced under 19 U.S.C. § 1515 that contest Customs's denial of a protest. 28 U.S.C. § 1581(a). An action before the court warrants summary judgment "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." USCIT R. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists only when the court could resolve a factual element under the applicable law in favor of either party. *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968 (Fed. Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986)). If no dispute over a material fact would impact the outcome of the suit and the action focuses solely on the proper classification of the merchandise, as in this case, the court may grant summary judgment. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed Cir. 1998).

The court applies a two-step analysis when determining whether Customs properly classified the imported merchandise. *Pillowtex Corp. v. Unites States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999) (citing *Bausch & Lomb, Inc.*, 148 F.3d at 1365). The court first must ascertain the meaning of the terms within the relevant tariff provision and subsequently determine whether the subject merchandise fits within those terms. *Id.* The first step presents a question of law, *Franklin v. United States*, 289 F.3d 753, 757 (Fed. Cir. 2002), while the second concerns issues of fact. *Pillowtex Corp.*, 171 F.3d at 1373. Normally, the factual component of the Customs classification garners a presumption of correctness. 28 U.S.C. § 2639(a)(1). However, that

presumption does not apply to Customs's decision when no factual disputes surround the subject merchandise. *Intercontinental Marble Corp. v. United States*, 27 CIT 654, 655 n.3, 264 F. Supp. 2d 1306, 1309 n.3 (2003), *aff'd*, 381 F.3d 1169 (Fed. Cir. 2004).

### III.  Discussion

A.  The General Rules of Interpretation

The GRIs govern the classification of goods under the HTSUS. *Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262, 1264 (Fed. Cir. 2004). The court applies the GRIs in numerical order and once a particular rule provides proper classification, the court may not consider any subsequent GRI. *See Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998). The products in this case are subject to classification pursuant to the first rule, GRI 1, which holds that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1; *see also Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). Absent contrary legislative intent, the court must construe HTSUS terms "according to their common and commercial meanings." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citation omitted). The Explanatory Notes ("EN") that accompany each Chapter of the HTSUS provide persuasive assistance to the court in ascertaining the correct classification of the merchandise, though the explanations do not constitute legally binding authority. *See Lonza, Inc. v. United States*, 46 F.3d 1098, 1109 (Fed. Cir. 1995). Once it determines that the particular heading controls the analysis, the court must look to the subheadings to find the correct classification for the merchandise. *See Orlando Food Corp.*, 140 F.3d at 1440. Therefore, under GRI 1, determining the most

Court No. 06-00038 Page 9

appropriate classification for the merchandise involves a "close textual analysis of the language of the headings and the accompanying explanatory notes." *Bauer Nike Hockey USA, Inc. v. United States*, 27 CIT 1645, 1652, 305 F. Supp. 2d 1345, 1351 (2003), *rev'd on other grounds*, 393 F.3d 1246 (Fed. Cir. 2004) ("*Bauer*").

**B. The Classification of the Subject Merchandise**

While Defendant maintains that it correctly classified the merchandise under Chapters 61 and 62 of the HTSUS, Def. Mot. for Summ. J. 8, 21-28, LeMans argues that two provisions under Heading 9506 (subheading 9506.91.00, at a duty rate of 4.6% *ad valorem*, or in the alternative 9506.99.60, at a rate of 4% *ad valorem*) best describe the subject jerseys, pants and jackets.[10] Pl. Mot. for Summ. J. 3-23. Moreover, Plaintiff contends that "the specialized nature and purpose of [its] goods preclude them from classification in [C]hapters 61 or 62." Pl. Mot. for Summ. J. 23. The central question in this case is whether the subject merchandise constitute "other sports equipment" classifiable under Chapter 95 or whether Customs correctly classified

---

[10] Heading 9506 provides in relevant part:

| | |
|---|---|
| 9506 | Articles and equipment for general physical exercise, gymnastics, athletics, other sports (including table-tennis) or outdoor games, not specified or included elsewhere in this chapter; swimming pools and wading pools; parts and accessories thereof: |
| | . . . |
| | Other: |
| 9506.91.00 | Articles and equipment for general physical exercise, gymnastics or athletics; parts and accessories thereof. |
| | . . . |
| 9506.99 | Other |
| | . . . |
| 9506.99.60 | Other. |

Court No. 06-00038                                                                                             Page 10

the goods in the first instance as certain apparel under Chapters 61 and 62. Because the motocross jerseys, motocross pants, and motorcycle jackets are described by the terms of the respective headings in Chapters 61 and 62, and are wearing apparel, the court agrees with Customs's classification of the subject merchandise.

### 1. The Motocross Jerseys & Pants

The subject motocross jerseys constitute a knitted "sweater" under the plain language of Heading 6110. Neither the HTSUS nor the legislative history defines the term sweater. Under the common meaning of those terms, *see Carl Zeiss, Inc.*, 195 F.3d at 1379, a sweater describes "a knitted or sometimes crocheted elastic jacket or pullover made in various styles and of various materials and usu[ally] having ribbing around the neck, cuffs, and lower edge," and a pullover comprises "a garment (as a sweater, shirt, or blouse) that is put on by being pulled over the head and is usu[ally] made without a placket or similar opening."[11] *Webster's Third New International Dictionary* 1840, 2308 (2002). A garment typifies "an article of outer clothing (as a coat or dress) usu[ally] exclusive of accessories," and clothing means a "covering for the human body or garments in general: all the garments and accessories worn by a person at any one time." *Webster's Third New International Dictionary* 428, 936 (2002); *see also H.I.M./Fathom, Inc. v. United States*, 21 CIT 776, 781, 981 F. Supp. 610, 615 (1997) (citing *Webster's Third New International Dictionary* 428, 936 (1993)). In relevant part, the EN to 6110 adds that the heading covers "a category of knitted or crocheted articles . . . designed to cover the upper parts of the body (jerseys, pullovers, cardigans, waistcoats and similar articles)." EN

---

[11] A "placket" is "a finished slit in a garment." *Webster's Third New International Dictionary* 1728 (2002).

61.10. The jerseys consist of synthetic, knit-patterned fabrics cut in assorted designs and made with various mesh and ventilated materials that cover the human body at a particular time, i.e., while engaging in motocross activities and other power sports riding. Pl. Resp. to Def. First Interrogs. 5-6. Each of the jerseys has a small placket, and an individual must pull the article over his head to wear it. *See, e.g.*, Men's Core S5 Jersey, Pl. Mot. for Summ. J. Ex. 12. This description fits closely with the terms of Heading 6110, and because the goods are wearing apparel, *see Admiral Craft Equip. Corp. v. United States*, 82 Cust. Ct. 162, 164 (1979) (not reported in F. Supp.), the court upholds Customs's classification of the jerseys under subheading 6110.30.30 of the HTSUS.

     Similarly, using the HTSUS-defined meaning of relevant terms and the common understanding of "garment," *see Carl Zeiss, Inc.*, 195 F.3d at 1379, the language of Heading 6210 controls the classification of the motocross pants. As a garment, the pants cover the human body, and an individual wears the article of outer clothing at a particular time – when she rides on motocross tracks, supercross tracks, or other off-road courses. Hart Dep. at 12:13-16. Moreover, the pants include certain textile fabrics that fall under Headings 5903 and 5906,[12] Note 1 to Chapter 59, HTSUS, in that the articles consist of some combination of the following: heavy-duty nylon mesh, heavy-duty ballistic woven nylon fabric, heavy-duty woven polyester,

---

[12] The term "textile fabric" applies to, *inter alia*, fabrics made of man-made fibers produced by the polymerization of organic monomers, such as polyester and polyurethane, as well as those fibers made through the chemical transformation of natural organic polymers. Note 1(a)-(b) to Chapter 54, HTSUS.

heavy-duty polyester, and Keprotec®.[13]  Pl.'s Statement of Undisputed Material Facts ¶ 40; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 40.  These man-made fibers form the "mesh panels for venting, heat resistant inner leg areas," and the stretch panels "in the legs, seat, and crotch area."  Pl. Resp. to Def. First Interrogs. 5.  The pants also conform to the relevant EN to Heading 6210.  EN 62.10 (stating that heading covers "all garments made up of . . . textile fabrics (other than knitted or crocheted fabrics) of heading 59.03, 59.06 or 59.07") (emphasis removed).  The description of the pants situates the article squarely within the terms of Heading 6210 and the class of goods used as wearing apparel.  *See Admiral Craft Equip. Corp.*, 82 Cust. Ct. at 164.  Therefore, the court also upholds Customs's classification of the pants under subheading 6210.40.50 of the HTSUS.

   **2. The Motorcycle Jackets**

   The common definition of an "overcoat" encompasses the subject motorcycle jackets and, therefore, the plain text of Heading 6201 covers these articles.  A word not defined by the HTSUS or in legislative history, an overcoat connotes "a coat worn over a suit or other clothing," and "coat" indicates "an outer garment (as a raincoat) usu[ally] with long sleeves, a collar, and a single-breasted or double-breasted front opening made of fabric, fur, or plastic and varying in length and style according to fashion and use."  *Webster's Third New International Dictionary* 433, 1607 (2002).  An individual wears the jackets over other clothing and at a particular time, such as when he rides on the public street.  Pl. Resp. to Def. First Interrogs. 6.  The jackets also

---

   [13] Keprotec is a unique blend of several synthetic fibers – Cordura®, Dyanfil TS-70, Kevlar®, and polyurethane fibers.  Pl.'s Statement of Undisputed Material Facts ¶ 47; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 47.

vary in length and style to accommodate a rider's posture, with a cut that has longer sleeves and fuller shoulders. Pl. Resp. to Def. First Interrogs. 6-7. LeMans designed the Men's and Boys' articles to consist of a combination of the following materials: heavy-duty polyester knitted and mesh fabrics; Dynax nylon; and a heavyweight waxed cotton chassis. Pl.'s Statement of Undisputed Material Facts at ¶ 82; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts at ¶ 82. The jackets do not amount to "Men's or boys' suits, ensembles, suit-type jackets, blazers, trousers, bib and brace overalls, [or] breeches and shorts (other than swimwear)" under Heading 6203.[14] In finding that the description of the jackets conform with the text of Heading 6201 and identify with wearing apparel, *see Admiral Craft Equip. Corp.*, 82 Cust. Ct. at 164, the court upholds Customs's classification of the garments under subheadings 6201.92.15, 6201.93.30, and 6201.93.35.

---

[14] A "suit" is "a set of garments composed of two or three pieces made up, in respect of their outer surface, in identical fabric and comprising," *inter alia*, a garment designed to cover the upper part of the body and another article that covers the lower part of the body. Note 3(a) to Chapter 62, HTSUS. Importantly, "[a]ll of the components of a 'suit' must be of the same fabric construction, color, and composition," *id.*, a requirement that places the subject jackets outside of this definition. That requirement also prevents classification of the merchandise as either an "ensemble" or a "suit-type jacket" under Heading 6203. Note 3(b) to Chapter 62, HTSUS; *Webster's Third New International Dictionary* 1206 (2002) (defining "jacket" as "a garment like a coat for the upper body usu[ally] having a front opening, collar, lapels, sleeves, and pockets, made in varying lengths from waist to hip, and worn separately or as part of a suit"). Moreover, the different nature of a blazer disqualifies it as an accurate description of the merchandise. *Webster's Third New International Dictionary* 232 (2002) (defining "blazer" as "a single-breasted sports jacket of flannel or other fabric in bright stripes or solid color made usu[ally] with a notched collar, patch pockets, and sometimes decorated edges). Finally, unlike the jackets at issue, the terms breeches, overalls, shorts, and trousers all address articles that cover the lower body in part. *See Webster's Third New International Dictionary* 274, 1606, 2102, 2453 (2002).

Court No. 06-00038                                                                                           Page 14

**C.  The Subject Goods Are Not Eligible for Classification Under Chapter 95 of the HTSUS**

After providing what it understands as the controlling definition for "equipment," Pl. Mot. for Summ. J. 3-4, LeMans avers that the jerseys, pants, and jackets constitute "sports equipment" under Heading 9506.  Pl. Mot. for Summ. J. 5-23.  In the event that the subject goods are classifiable both as other sports equipment under Chapter 95 and apparel in Chapters 61 and 62, LeMans argues that GRI 3(a) compels the court to find that Chapter 95 more specifically describes the subject merchandise.  Pl. Mot. for Summ. J. 29-30.  The court is not persuaded by either argument.

The EN to Heading 9506 demonstrates that the subject merchandise is of a different nature and character than those classifiable as "sports equipment" under Chapter 95.  To qualify as "equipment" for a sport, the good should generally provide "what is necessary, useful, or appropriate."  *See Webster's Third New International Dictionary* 768 (2002) (defining "equipment" as "the equipping of a person or thing" and "equip" as "to provide with what is necessary, useful, or appropriate"); *see also Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002) (explaining that "definition offered for 'equipment' includes those articles that are necessary and specifically designed for use in athletics and other sports").  While the subject merchandise arguably constitutes useful, if not necessary, articles to motocross and motorcycle riding, Subsection B of EN 95.06 distinguishes the subject merchandise from articles

Court No. 06-00038                                                                 Page 15

typically classified under Heading 9506.[15] The examples listed in Subsection B center on non-clothing articles and do not describe apparel like the subject merchandise. Although Example 13 suggests that some apparel-like items might fall under Heading 9506, those examples consist almost entirely of certain internal guards or pads pieced together by minimal textile components,

---

[15] In relevant part, the EN states that Heading 9506 covers requisites for other sports, such as

(1)   Snow-skis and other snow-ski equipment, (e.g., ski-fastenings (ski-bindings), ski brakes, ski poles).
(2)   Water-skis, surf-boards, sailboards and other water-sport equipment, such as diving stages (platforms), chutes, divers' flippers and respiratory masks of a kind used without oxygen or compressed air bottles, and simple underwater breathing tubes (generally known as "snorkels") for swimmers or divers.
(3)   Golf clubs and other golf equipment, such as golf balls, golf tees.
(4)   Articles and equipment for table-tennis (ping-pong), such as tables (with or without legs), bats (paddles), balls and nets.
(5)   Tennis, badminton or similar rackets (e.g., squash rackets), whether or not strung.
(6)   Balls, other than golf balls and table-tennis balls, such as tennis balls, footballs, rugby balls and similar balls (including bladders and covers for such balls); water polo, basketball and similar valve type balls; cricket balls.
(7)   Ice skates and roller skates, including skating boots with skates attached.
(8)   Sticks and bats for hockey, cricket, lacrosse, etc.; chistera (jai alai scoops); pucks for ice hockey; curling stones.
(9)   Nets for various games (tennis, badminton, volleyball, football, basketball, etc.).
(10)  Fencing equipment: fencing foils, sabres and rapiers and their parts (e.g., blades, guards, hilts and buttons or stops), etc.
(11)  Archery equipment, such as bows, arrows and targets.
(12)  Equipment of a kind used in children's playgrounds (e.g., swings, slides, see-saws and giant strides).
(13)  Protective equipment for sports or games, e.g., fencing masks and breast plates, elbow and knee pads, cricket pads, shin-guards.
(14)  Other articles and equipment, such as requisites for deck tennis, quoits or bowls; skate boards; racket presses; mallets for polo or croquet; boomerangs; ice axes; clay pigeons and clay pigeon projectors; bobsleighs (bobsleds), luges and similar non-motorised vehicles for sliding on snow or ice.

EN 95.06 (B).

a description that does not fit the subject merchandise. *See* Pl. Mot. for Summ. J. Exs. 7-17. In fact, the type of merchandise represented in Example 13 more accurately describes the products that riders typically will attach directly to their body, with the subject merchandise worn over those hard guards and braces. Pl.'s Statement of Undisputed Material Facts ¶¶ 18, 58, 120; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ¶¶ 18, 58, 120; Hart Dep. 10:4-23, 13:13, 14:19, 19:7-13, 27:24, 29:11, 40:1, 43:20. That riders rely on hard protection worn underneath the jerseys, pants, and jackets illustrates the nature of the subject goods as apparel and not sports equipment. Moreover, Note 1(e) to Chapter 95 provides additional support for the conclusion that goods like the subject merchandise do not constitute sports equipment. Chapter 95, Note 1(e), HTSUS (explaining that Chapter 95 does not cover, *inter alia*, "[s]ports clothing or fancy dress, of textiles, of [C]hapter 61 or 62"). Thus, Heading 9506 does not control the classification of the subject merchandise.

LeMans does not convince the court that the Federal Circuit meant to provide an authoritative definition of "equipment" in *Bauer*, or that the analysis therein governs the classification of the subject merchandise in this case. 393 F.3d 1246.[16] In that case, Customs had classified ice hockey pants – constructed primarily of an exterior nylon or polyester textile shell and an interior assembly of hard nylon plastic guards and soft polyurethane, polyethylene, or polyester foam padding attached to a belt – under subheading 6211.33.00 of the HTSUS,[17] a

---

[16] To be sure, the *Bauer* decision can be read to caution against an overly restrictive interpretation of "equipment." 393 F.3d at 1250-51.

[17] This subheading provides covers "track suits, ski-suits and swimwear; other garments" comprised "[o]f man-made fibers." 6211.33.00, HTSUS.

Court No. 06-00038 Page 17

classification upheld by this Court. *Bauer Nike Hockey USA, Inc.*, 27 CIT at 1651-61, 305 F. Supp. 2d at 1351-59. On appeal, Plaintiff Bauer Nike Hockey USA, Inc. alleged that its merchandise was more appropriately classifiable under subheading 9506.99.25.[18] *Bauer*, 393 F.3d at 1250. The Federal Circuit disagreed with how this Court construed the term "equipment," *id.* at 1250-51, but in so doing did not give its opinion on what constituted a controlling definition of that term. *See id.* The Federal Circuit explained that "equipment" defines "the equipping of a person or thing" and that "equip" means "to provide with what is necessary, useful or appropriate." *Id*. at 1251 (citing *Webster's Third New International Dictionary* 768 (1993)) (quotation marks omitted). The Federal Circuit noted that the definition for equipment "provides no support for the Court of International Trade's conclusion that an item must be necessary to be equipment because the definition uses the disjunctive, 'or,' in the definition of 'equip,' not the conjunctive, 'and.'" *Id*. Moreover, in finding that Chapter 95 covered the merchandise at issue in *Bauer*, the Federal Circuit reached its decision using GRI 3(a). *Id*. at 1252-53. In this case, the court bases its decision on GRI 1 and finds no need to resort to an analysis under GRI 3. Therefore, the court finds that *Bauer* does not control its analysis.

The Customs classification of certain gear after the Federal Circuit's decision in *Bauer* further demonstrates that the subject goods are distinct from those classifiable under Heading 9506. In 2005, Customs classified under Heading 9506 a shin-guard made of hard plastic with

---

[18] Subheading 9605.99.25 controls the classification of certain sports equipment – "[i]ce-hockey and field-hockey articles and equipment, except balls, and parts and accessories thereof." 9506.99.25, HTSUS.

an ethylene-vinyl acetate foam backing permanently encased in a specially-fitted polyester sock, noting that the "hard protective guard is specially-fitted to the polyester sock in which it is encased and it is not removable." HQ 967738 (Sept. 21, 2005). However, later that year, Customs determined that knitted polyester and cotton shorts and pants with high-density foam padding designed for soccer goalkeepers did not constitute sports equipment under Heading 9506, but instead classified the soccer pants and shorts under Heading 6114, HTSUS. HQ 967957 (Dec. 9, 2005). Customs reasoned that while the articles contained various protective features, the padding appeared "in isolated areas where goalkeepers are most likely to make contact with the ground. Th[at] padding is insubstantial, offering only some cushioning from the ground and protection against ground abrasions." *Id*. Similar to the soccer pants and shorts, the subject merchandise incorporates limited padding to isolated areas of the article, and they do not contain nor are predominantly comprised of hard plastic like the shin-guards in HQ 967738 or the ice hockey pants in *Bauer*. *See* Pl. Mot. for Summ. J. Exs. 7-17.

Finally, as previously noted, the terms of the relevant headings within Chapters 61 and 62 describe the subject merchandise. Because GRI 1 resolves this classification inquiry, the court need not consider any subsequent GRI. *See Mita Copystar Am.*, 160 F.3d at 712.

### IV. Conclusion

Using GRI 1, the court upholds Customs's classification of the subject merchandise under the relevant provisions of Chapters 61 and 62 of the HTSUS.

Dated:   February 8, 2010                                     /s/ Judith M. Barzilay  
        New York, New York                              Judith M. Barzilay, Judge

Slip Op. 10-14

UNITED STATES COURT OF INTERNATIONAL TRADE

------------------------------------------------------x
                                                      :

LEMANS CORPORATION,                :

        Plaintiff,                      :

        v.                               :     **Before: Judge Judith M. Barzilay**
                                         :     **Court No. 06-00038**
UNITED STATES,                    :

        Defendant.                   :

------------------------------------------------------x

## JUDGMENT

Upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's Cross-Motion for Summary Judgment, the accompanying briefs, responses, and replies submitted by the parties, the court's opinion in this case published on February 8, 2010, and all other papers filed in this action, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Cross-Motion for Summary Judgment is **DENIED**; it is further

**ORDERED** that the U.S. Customs & Border Protection's classification of the subject merchandise under Chapters 61 and 62 of the Harmonized Tariff Schedule of the United States is **AFFIRMED**; and it is further

**ORDERED** that this case, Court No. 06-00038, is **DISMISSED**.

Date:  February 8, 2010                                    /s/ Judith M. Barzilay
      New York, New York                               Judith M. Barzilay, Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                       Deputy Clerk